THE PEOPLE, PLAINTIFF AND RESPONDENT, *v.* ANGLADA, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Aguadilla in an action for rape.

No. 628.—Decided January 14, 1914.

RAPE—STATEMENT OF VICTIM TO THIRD PARTY IMMEDIATELY AFTER CRIME—RES GESTAE—SCREAMS OF VICTIM.—When immediately after she has been raped a woman screams and running to her mother-in-law, who lived near the place where the crime was committed, tells her who her ravisher was, such statement made in said circumstances is not hearsay evidence, but on the contrary is evidence admissible to show the commission of the crime.

ID.—EVIDENCE.—Even supposing that the statements of the victim made to a third party immediately after the crime were not admissible in evidence, as the commission of the crime was proved in this case by other evidence, the accused was not prejudiced by the admission of said statements.

The facts are stated in the opinion.

*Mr. Charles E. Foote, fiscal,* for The People.

*Messrs. Travieso & Iriarte* for appellant.

MR. JUSTICE WOLF delivered the opinion of the court.

This was a prosecution for rape. The principal controversy in this court was over the admission in evidence of certain statements made by the prosecuting witness, Isolina Rodríguez, to her mother-in-law, Andrea González, immediately after the alleged violent act.

Isolina Rodríguez first testified and told how she and her husband went to live temporarily with his mother, Andrea González; that on the morning of June 25, 1912, she left the house of her mother-in-law for the purpose of washing some clothes at a brook a short distance away. While there in the occupation of washing, so she testified, she was seized from behind by José Anglada, who was armed with a knife and who, after throwing her to the ground, committed the criminal act for which this prosecution is brought. She testified to a partial struggle with the defendant in which her clothes were torn, but she was able to make no substantial resistence or any outcry because he threatened to kill her and because he bore a knife. While she was thus assailed she lost consciousness, and when she recovered her senses Anglada was gone. She then arose shrieking and in response to her cries her mother-in-law ran toward her.

Carlas Morales testified that she was washing clothes in the brook a little below where Isolina was washing. She did not see Isolina because the latter was in a depression and the brook makes curves. But as the witness was going into the house she heard cries and she saw José Anglada entering the house of his uncle, León Anglada, and heard the voice of Isolina Rodríguez exclaiming "Ay! Andreíta, Ay! Andreíta," in a loud tone like a person calling for help, and she saw the mother-in-law go out to meet Isolina.

Andrea González was then called and testified in substance that she was the mother-in-law of Isolina Rodríguez; that she saw Isolina go out to wash on the day of the alleged crime,

but she did not stay a long time because between nine and ten Isolina shouted for her; that the latter was shouting from the other side of a little hill "Ay! Andreíta, Ay! Andreíta"; that she ran towards Isolina who was coming very quickly with her clothes picked up (*recogidas*), weeping and screaming, and she said that José Anglada had come to the brook where she was with a knife to make her yield to him, and that Isolina said nothing more.

There is a statement of the case in the record and also a separate bill of exceptions.

The bill of exceptions sets forth that during the testimony of Andrea González the *fiscal* asked her what Isolina Rodríguez had stated when she came weeping and screaming toward her house, and the defense objected to the witness's replying to this question because the declarations of an injured person made to a third person some time after the realization of the act complained of are hearsay and may not be taken in consideration at the trial. The *fiscal* alleged that the declarations made by Isolina Rodríguez to Andrea González were part of the *res gestae,* and the court decided that such declarations were admissible as proof, inasmuch as they formed a part of the *res gestae,* having been made immediately after the supposed crime and when the moral impression of the act still lasted. The witness then repeated the remarks of Isolina that we have set forth, and the defense took an exception to the ruling.

Emilia Alvarez heard Isolina Rodríguez shrieking and rushed toward her and saw José Anglada going rapidly to the house of his uncle. She heard the cry "Ay! Andreíta, Ay! Andreíta."

Ramón Rivera, a brother-in-law of Isolina Rodríguez, testified that he saw Anglada the day after he was released from jail under bail and that the latter said he desired to meet the husband of Isolina Rodríguez in order that he might satisfy him for the night that he, Anglada, had passed in jail; that he had done to Isolina that which pleased him and

it seemed strange to him that, as it was to the pleasure of both him and her, they had taken him before the court.

For some reason about which the record is not perfectly clear, José Anglada went before Municipal Judge Betancourt to swear that during the whole day of the alleged event he, Anglada, was working as a foreman on the farm of La Plata Agricultural Company and the municipal judge testified to this statement.

Enrique Roselló testified that he was the timekeeper (*listero*) of the Plata Agricultural Company and kept the lists of the laborers and foremen who work there, and that in the list of June 25 the name of José Anglada appears neither as a foreman nor as a laborer.

The defense offered no evidence.

It will be seen that no objection was made to the testimony of Andrea González with respect to the cries of Isolina Rodríguez, namely "Ay! Andreíta, Ay! Andreíta"; and very properly so, because we think it is well settled in every part of the United States that this outcry was a natural thing for a woman to do immediately after an attack and was properly admissible as a complaint. Indeed, at the ancient common law a woman was under a duty to make an outcry after she had been thus outraged. See Wigmore, paragraph 1760.

We think that the words Isolina Rodríguez spoke to her mother-in-law are so closely connected with the event as to be really properly admissible as a part of the same outcry of the injured woman, the words being uttered in such close causal connection and so soon after the alleged crime. In a number of States declarations of this kind would be properly admissible as part of the *res gestae*. *State* v. *Imlay,* 61 Pac., 557; *Castillo* v. *The State,* 31 Tex. Cr. Rep., 145; *People* v. *Gage,* 62 Mich., 271; *State* v. *Peter,* 14 La. Ann., 521; *Snowden* v. *United States,* 2 App. D. C., 89; *State* v. *Horan,* 32 Minn., 396, 50 A. R., 584, and other cases cited therein. Further liberality in the application of the rule of *res gestae* is shown

in *Ins. Co.* v. *Mosely,* 8 Wall, 399; *McMurrin* v. *Rigly,* 80 Iowa, 326, 45 N. W., 878.

The liberality of the Supreme Court of the United States is not followed in California or Massachusetts or other States. *Commonwealth* v. *Trefethen,* 157 Mass., 189; *People* v. *Ah Lee,* 60 Cal., 85; *People* v. *Dewey,* 2 Idaho, 83, and the cases cited in these decisions, and the cases which follow these decicions in Iowa, Missouri and other States. In our researches, however, we have been unable to find a case in which declarations of the injured woman made so shortly after the crime have been refused admission.

Mr. Wharton, in his work on Criminal Evidence, p. 273, points out that the better rule in ordinary matters of *res gestae* is that declarations made after the event is concluded ought not to be admitted in evidence, but he points out the exceptions in cases of rape and says that the exception ought to be limited to such cases. He further points out in paragraphs 262 *et seq.* that *res gestae* are practically events speaking for themselves and in this case the spontaneous exclamations and words of Isolina Rodríguez surely spoke for themselves.

Mr. Wigmore in his work on Evidence points out, paragraph 1139, that one of the exceptions to the hearsay rule permits the spontaneous declarations of a person suddenly excited by an extrinsic occurrence to be admitted as hearsay testimony, and under paragraph 1747 he says: "The general principle is based on the experience that under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock" and that "Since this utterance is made under the immediate and uncontrolled domination of the senses and during the brief period when considerations of self-interest could not be brought fully to bear by reasoned reflection the

utterance may be taken as particularly trustworthy," and he quotes from the decisions of various courts. A quotation from Bleckly, C. J., in *Travelers' Ins. Co.* v. *Sheppard,* 85 Ga., 751, 776, 12 S. E., 18, is peculiarly applicable; namely:

"There must be no fair opportunity for the will of the speaker to mould or modify them. His will must have become and remained dormant, so far as any deliberation in concocting matter for speech or selecting words is concerned. Moreover, his speech, besides being in the present time of the transaction, must be in the presence of it in respect to space. He must be on or near the scene of action or of some material part of the action. His declarations must be the utterance of human nature, of the *genus homo,* rather than of the individual. Only an oath can guarantee individual veracity. But spontaneous impulse may be sufficient sanction for the speech of man as such—man distinguished from this or that particular man. True, the verbal deliverance in each instance is that of an individual person. But if the state of his mind be such that his individuality is for the time being suppressed and silenced, so that he utters the voice of humanity rather than of himself, what he says is regarded by the law as in some degree trustworthy."

And it may also be seen in following Wigmore in his reasoning in regard to rape in paragraphs 1760 *et seq.,* that this very learned and accurate author believed in liberality in cases of rape where the declarations are made so closely connected with the event itself, and calls it a typical application of the spontaneous-exclamations principle.

The case of *The People* v. *Maldonado,* 17 P. R. R., 22, is not in point. In that case all the complaints were made a considerable time after the event. The court itself attempted to strike out the words but did so imperfectly.

We have no doubt of the admissibility of the declarations of Isolina Rodríguez under the circumstances of this case. Furthermore, if there was any doubt we do not think that the defendant suffered any real prejudice by their admission. What really affected him, if anything, was the spontaneous outcry of Isolina Rodríguez "Ay! Andreíta, Ay! An-

dreíta," to which no objection was made. The declarations of Isolina Rodríguez were not needed to connect the defendant with the crime. He was seen closely upon the scene of action and ran away from it. He admitted the carnal intercourse. He sought to establish an *alibi* which was shown to be false. Several witnesses heard the cry of "Ay! Andreíta, Ay! Andreíta" besides the mother-in-law, and under these circumstances we would think applicable the provisions of the law of May 30, 1904, when it says that the judgment shall not be reversed unless the error appearing in the record was calculated to injure the rights of either of the parties and was duly excepted to in the trial court. We do not think that the admission of the evidence excepted to injured the defendant when there was evidence *aliunde* to show the commission of the crime.

Two other assignments of error were made. About one of them there is nothing in the statement of the case to justify a review. The other is that the proof was insufficient to convict, which is sufficiently discussed in reviewing the exception.

The judgment must be affirmed.

*Affirmed.*

Justices del Toro and Aldrey concurred.

Mr. Chief Justice Hernández did not sit at the hearing of this case.